IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                          Criminal No. 3:96cr66-06

LEONEL R. CAZACO

## MEMORANDUM OPINION

This matter is before the Court the DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A) (ECF Nos. 2029 and 2032)[1] and the RESPONSE OF THE UNITED STATES IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE (ECF No. 2031). For the reasons set forth below, the DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A) (ECF Nos. 2029 and 2032) will be denied.

## BACKGROUND

Leonel R. Cazaco was a member of a very violent crack cocaine distribution gang known as the "Poison Clan" (sometimes the "Clan") which was an adjudicated Racketeering Influenced and Corrupt Organizations Act enterprise, formed in 1987 in Brooklyn and Queens, New York. Thereafter, it operated in Richmond and Virginia Beach, Virginia, Baltimore, Maryland, Pittsburgh, Pennsylvania, and East Orange, New Jersey. The Clan engaged in patterns of

---

[1] ECF No. 2039 is filed under seal; ECF No. 2032 is a redacted version.

racketeering activity and the commission of acts of violence was one method by which a member of the Clan could enhance his position in the organization.

The Superseding Indictment in this case ran more than 100 pages and contained 37 counts. Cazaco was named in, and convicted of, 15 of those counts.

The record shows that Cazaco was actively involved with the Poison Clan from September 1993 until June 1995. During that time, Cazaco supervised at least seven other individuals in distributing approximately one kilogram of crack cocaine per week. He was accountable for the distribution of at least 91 kilograms of crack cocaine.

Cazaco also was actively involved in a triple homicide (referred to as the Sugar Bottom murders) in which Cazaco and members of the Clan participated in order to secure a more favorable marketing location (Sugar Bottom) for their crack drug dealing by eliminating a marijuana distribution operation at a residence that the Clan wanted to use for its crack business. The Clan agreed that the occupants of the Sugar Bottom location must be killed and dispatched a team of five to accomplish the murders. Cazaco and one other Clan member were selected to rob and kill everyone inside. And, indeed, the group, including Cazaco, killed three people, Marco Baylor, Anthony Baylor, and Anthony Merritt.

A fourth man, Charles Meekins, was shot in the head and left to die. Bullets from Anthony Baylor and Anthony Merritt were matched by ballistic comparison to Cazaco's gun. In April 1994, Cazaco, again in aid of the business of the Poison Clan, robbed Jose Hinton and murdered Walter Twitty. For his role in the offense, Cazaco was convicted on Count 21, conspiracy to interfere with commerce by robbery.[2]

The offenses of conviction were as follows:

| | |
|---|---|
| Count 1: | Violation of RICO (involving twelve specified racketeering acts and more than twenty alleged acts of violence and murder), in violation of 18 U.S.C. § 1962(c); |
| Count 3: | Conspiracy to Distribute Cocaine Base and Powder Cocaine, in violation of 21 U.S.C. §§ 846 and 841; |
| Counts 10, 11 and 12: | Murder in Furtherance of Continuing Criminal Enterprise ("CCE"), in violation of 21 U.S.C. § 848(e)(1)(A); |
| Count 13: | Conspiracy to Murder in Aid of Racketeering Activity, in violation of 18 U.S.C. § 1959(a)(5); |
| Counts 14, 15 and 16: | Murder in Aid of Racketeering Activity, in violation of 18 U.S.C. § 1959(a)(1); Count 17: Assault with Dangerous Weapon in Aid of Racketeering Act, in violation of 18 U.S.C. § 1959(a)(3); |

---

[2] Cazaco was acquitted of murder in aid of racketeering (Count 23) (the Twitty murder). He was, however, found guilty on Count 1 which charged participation in RICO and violation of RICO and to do that, the jury found that it had been proven that Racketeering Act No. 11 had been proven which was a conspiracy to attempt to rob Hinton and to murder Twitty.

| | |
|---|---|
| Count 18: | Use of Firearm During a Violent Crime, in violation of 18 U.S.C. § 924(c); |
| Counts 19 and 26: | Possession of Firearm by Convicted Felon, in violation of 18 U.S.C. § 922(g)(1); |
| Count 21: | Conspiracy to Interfere with Commerce by Violence, in violation of 18 U.S.C. § 1951(a); |
| Count 25: | Use of Firearm During a Violent Crime, in violation of 18 U.S.C. § 924(c).[3] |

On November 7, 1997, Cazaco was sentenced to a term of life imprisonment plus 300 months. The term consists of:

- life on Count 1;
- life on Count 3 to run concurrent with the sentence imposed on Count 1;
- life on Count 10 to run concurrent with the sentence imposed on Count 1;
- life on Count 11 to run concurrent with the sentence imposed on Count 1;
- life on Count 12 to run concurrent with the sentence imposed on Count 1;
- 120 months on Count 13 to run concurrent with the sentence imposed on Count 1;

---

[3] The face of the Superseding Indictment numbers the counts by using Arabic numbers whereas the substance of the Superseding Indictment uses the written word to number the counts. Most of the papers use Arabic numerals and so too does the Court in this Opinion.

- life on Count 14 to run concurrent with the sentence imposed on Count 1;

- life on Count 15 to run concurrent with the sentence imposed on Count 1;

- life on Count 16 to run concurrent with the sentence imposed on Count 1;

- 240 months on Count 17 to run concurrent with the sentence imposed on Count 1;

- 60 months on Count 18 to run concurrent with the sentence imposed on Count 1;

- 120 months on Count 19 to run concurrent with the sentence imposed on Count 1;

- 240 months on Count 21 to run concurrent with the sentence imposed on Count 1;

- 240 months on Count 25 to run consecutive to the sentences imposed on Counts 1[4] and 18; and

- 120 months on Count 26 to run concurrent with the sentence imposed on Count 1.[5]

---

[4] The United States agrees that Cazaco's conviction under 18 U.S.C. § 924(c) on Count 25 is no longer valid. (ECF No. 2031, fn. 1).

[5] Cazaco also entered a plea of guilty in United States v. Cazaco, Criminal No. 3:95cr87 and was sentenced to a term of 240 months imprisonment for maintaining a place for the distribution of controlled substances in violation of 21 U.S.C. § 856.

5

However, Cazaco was also sentenced to a term of 60 months on the first count of conviction under 18 U.S.C. § 924(c) (Count 18). He must serve the conviction on that count. It would be served upon completion of the eight life sentences.

Cazaco presented a motion for compassionate relief to the Warden of his facility. Thereafter, he filed this action. However, in this motion Cazaco presents claims that were not presented to the Warden. In the request made to the Warden, Cazaco sought release because he suffers "from, among other things, deep vein thrombosis." In this motion, he claims that he suffers from obesity, chronic circulatory issues, varicose veins and varicocele. Nor did Cazaco assert there (with the Warden) as he does here that he was youthful offender sentenced before <u>Booker</u> and had stacked convictions under 18 U.S.C. § 924(c).

Because of the disparity between the grounds presented to the Warden and the grounds argued here, the Government contends that Cazaco has not properly exhausted his administrative remedies. The Government relies on <u>United States v. Williams</u>, 987 F.3d 700, 703 (7th Cir. 2021) and <u>United States v. Rivas</u>, 833 F. App'x 556, 558 (5th Cir. 2020) as well as some in-circuit district court cases. Cazaco has not responded to that charge.

6

It appears that the law in the Fourth Circuit is such that our Court of Appeals does not follow the views set forth by the Fifth and Seventh Circuits. Applying circuit law, there appears to be no bar to these proceedings presented by the exhaustion requirement of the statute.

Cazaco is confined at FCI Loretto (population 783). When the Government filed its papers, there were no positive COVID-19 cases and 613 cases have been reported in the past and all have recovered. It appears that all inmates have been offered a COVID-19 vaccine.

## DISCUSSION

The applicable statute, 18 U.S.C. § 3582(c)(1)(A), provides, in pertinent part, that, upon appropriate motion, the Court "may reduce the term of imprisonment . . . if it finds that 'extraordinary and compelling reasons' warrant such a reduction." It is settled that the burden is on the defendant to prove that extraordinary and compelling reasons exist for compassionate release under § 3582(c)(1)(A)(i). United States v. White, 378 F. Supp.3 784, 785 (W.D. Mo. 2019).

The "mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering the Bureau of Prison's statutory role, and extensive

professional efforts to curtail the virus' spread. United States v. Raia, 954 F.3d 594, 597 (3rd Cir. 2020). In assessing whether the record shows the existence of extraordinary and compelling reasons for compassionate release, courts consider, inter alia, the guidance of the CDC, and non-binding policy statements of the United States Sentencing Guidelines. See United States v. Beck, 425 F. Supp. 3d 573, 581-82 (M.D.N.C. 2019). The policy statements are not binding but are informative and may be considered. United States v. McCoy, 981 F.3d 271, 276 (4th Cir. 2020). The cases teach that, to constitute extraordinary and compelling reasons for compassionate release, medical conditions must be serious. Also, it is generally true that "chronic conditions that can be managed in prison are not a sufficient basis for compassionate release." United States v. Ayon-Nunez, No. 1:16-cr-130, 2020 WL 704785, at *2-3 (E.D. Cal. Feb. 12, 2020).

To establish existence of "extraordinary and compelling" reasons for compassionate release because of COVID-19, the defendant must show "both a particularized susceptibility to the disease and a particularized risk of contracting the disease at [his] prison facility." United States v. Feiling, 453 F. Supp.3d 832, 840 (E.D. Va. 2020); United States v. White, ___ F. Supp.3d ___, 2020 WL 1906845, at *1 (E.D. Va. April 23, 2020).

8

### 1. Particularized Susceptibility

Cazaco has established that he suffers from deep thrombophlebitis of superior veins (deep vein thrombosis), other circulatory issues, and obesity. The CDC recognizes deep vein thrombosis and obesity as presenting a risk of illness if COVID-19 is contracted. The other circulation issues are not recognized as COVID risk factors by the CDC.

However, the fact that a defendant has established a higher susceptibility to COVID-19 does not resolve the particularized susceptibility requirement because identified risk factor conditions must be serious to constitute extraordinary and compelling reasons. It appears from the record that the conditions on which Cazaco bases his motion are "chronic conditions that can be managed in prison [and thus] are not a sufficient basis for compassionate release." United States v. Ayon-Nunez, No. 1:16-cr-130, 2020 WL 704785, at *2-3 (E.D. Cal. Feb. 12, 2020). In addition, Cazaco has not established that his medical needs cannot be met while incarcerated and, indeed, the medical records filed herein outline that he receives regular medical care, adjustment of his medications, and testing related to the chronic health issues. In fact, Cazaco says that the thrombophlebitis is "in remission due to medications" and compression garments. And, he says that the DVT is being monitored.

9

Moreover, Cazaco, like almost all inmates at FCI Loretto, has been fully vaccinated with the Moderna vaccine and is due for a booster dose. The vaccine has proven effective in reducing the risk of contracting COVID-19 and the risk of serious consequences if it should be contracted. That fact, the high level of those vaccinated at FCI Loretto, and the fact that there are currently no cases reported at FCI Loretto, viewed in perspective of the record about Cazaco's claimed health conditions, strongly operate to preclude a finding that the particularized susceptibility test is met here.

In sum, Cazaco has not met the particularized susceptibility risk facet of the applicable test.

### 2. Particularized Facility Risk

Nor has Cazaco met the particularized facility risk component of the appropriate test. His motion cites press releases and information respecting the instances of COVID-19 among inmates and staff at BOP facilities nationwide, but provides no real evidentiary support of a particularized risk of contracting the disease at FCI Loretto (783 inmates), the defendant's facility of incarceration. Further, the record reflects that, at the time of the filing of the Government's papers, FCI Loretto had no active case of COVID-19 among inmates, two active cases of COVID-19 among

10

staff, and 613 inmates who had previously recovered from COVID-19.

On this record, Cazaco has not met the particularized facility component of the applicable test.

### 3. Assessment Under 18 U.S.C. § 3553(a)

But, even if Cazaco had met the particularized risk assessment and the particularized facility assessment (which he has not), it would be appropriate to deny compassionate release in perspective of the sentencing factors prescribed by 18 U.S.C. § 3553(a). Compassionate release, of course, is appropriate only where the defendant is not a danger to the safety of any other person or of the community. The defendant argues that he is not a danger to the community. That, he says, is because he has served 25 years in prison, has medical issues, and, at the age of 48, has limited mobility and thus is at a lower risk of recidivism. Considering Cazaco's convictions and offense conduct and his ready resort to violence, including murder, it cannot be concluded that Cazaco is not a danger to the community. In any event, it is Cazaco's burden to prove that he is not a danger, and, considering the record as a whole, he has not carried that burden.

Nor do the application or the factors under 18 U.S.C. § 3553 permit a grant of a motion for compassionate release.

11

The nature and circumstances of the offense and the history and characteristics of the defendant and the components of the statute have been fully set out above. And, it is appropriate to note that, as Cazaco acknowledges, his crimes were "heinous and warranted a substantial sentence of imprisonment." In mitigation, Cazaco argues that his "early life was tumultuous." And, indeed, that is correct. His mother immigrated to the United States from St. Kitts when Cazaco was six months old and he was left with his grandmother. He lived a very pleasant life (albeit not an abundant one) in St. Kitts with his grandmother. When he was eight, Cazaco was brought to the United States by his mother who by at that time had married and formed another family. The record discloses that Cazaco was ill-treated, indeed abused, by his mother so much so that he suffered severe physical and emotional abuse that traumatized him for years. He was taken away from his mother by social services when he was approximately 11 years old, placed in a children's home, and thereafter foster homes for three years. There he was exposed to the drug culture and adult criminal activity. (PSR, ECF No. 2012, ¶¶ 151 and 152).

As a practical matter, at approximately age 14, Cazaco was left to rely for himself on the streets and he turned to the drug trade. Indeed, his criminal history shows that he began selling drugs within a year of finding himself on the streets. (ECF No.

2012, ¶ 138). The Court well recalls the mitigation evidence put on by Cazaco at the death penalty phase of his case. It is fair to say that Cazaco's upbringing and the abuse that he suffered provided significant argument that the death penalty should not be levied upon him.

Also, as Cazaco argues, it is true that he was youthful when the offenses of conviction occurred. His involvement in the Poison Clan began when he was approximately 19 years of age and it lasted for approximately 24 months thereafter. On that basis, Cazaco argues that the developments in Miller v. Alabama, 567 U.S. 460 (2012) and subsequent cases provide a basis for concluding that he, as a youthful offender, ought to be relieved from the extremely serious sentence that he is now serving.

However, as the United States correctly argues, age at the time of the offense does not constitute extraordinary and compelling circumstances unless the factor of age is somehow linked to the commission of the offenses of conviction. There is nothing in this record that suggests that Cazaco's age was connected with the offenses of conviction. Indeed, rather than bespeaking immaturity and impulsiveness, Cazaco's conduct in the offenses of conviction teach that he was deliberate and planful and acted in a premediated way. For example, the record shows, as to the Sugar Bottom murders (committed to take over a desirable drug territory),

13

Cazaco and his co-actors intended to rob and kill and scouted the location to determine the best time to do so. Even his conduct during the Sugar Bottom murders shows a great deliberation after entering the facility and before murdering the people in that location. Three months later, there was a deliberate robbery and murder of Walter Twitty. There is no evidence that Cazaco's crimes were the product of youthful immaturity or impulsiveness. Hence, <u>Miller</u> and its progeny provide no basis for relief.

Of course, it is necessary to consider what sentence protects the public, and early release of Cazaco certainly does not provide that. Cazaco's criminal conduct was not really a one time offense. Even before and after his involvement with the Clan, Cazaco was involved in significant and serious criminal conduct. His criminal history category at the time of sentencing in this case was V. So he was a committed criminal by the time he joined the Poison Clan.

The defendant's early life circumstances are sad indeed, and there is no question about that. However, bad though they were, those circumstances do not excuse the murderous conduct and the drug dealing in which Cazaco was engaged and for which he is serving life sentences.

Cazaco's principal argument is that he has demonstrated significant rehabilitation since the conviction (ECF No. 2029 at 23). That asserted rehabilitation consists of a lack of recent

14

prison infractions, completing his GED, being designated to a medium level security facility, and completion of course work toward rehabilitation. Those steps are positive ones, but they cannot reasonably be characterized either as significant or unusual. Indeed, inmates are supposed to be infraction free when in prison. As to the course work, it appears that in 25 years, Cazaco has taken 18 courses of one kind or another. That is not unusual.

Cazaco's conduct while in prison is sufficiently laudable that he has received letters and commendations from prison personnel. However, self-improvement while in prison is the rule not the exception and prisoners are expected to obey the rules in prison and try to improve themselves.

There really is no issue of disparate sentencing here because of the extremely egregious conduct which warranted the imposition of life sentences in this case. Those sentences were, when imposed, and are, now necessary to protect the public, to promote respect for the law, and to deter the defendant and others who would be so inclined to similar criminal conduct.

For the foregoing reasons, consideration of the sentencing factors of § 3553 does not counsel a different conclusion.

## CONCLUSION

For the reasons outlined above, the DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A) (ECF Nos. 2029 and 2032) will be denied.

It is so ORDERED.

/s/   REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May 5, 2022